# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01234-SCT

*MISSISSIPPI DEPARTMENT OF REVENUE*

*v.*

*MISSISSIPPI POWER COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/24/2013 |
| TRIAL JUDGE: | HON. SANFORD R. STECKLER |
| TRIAL COURT ATTORNEYS: | MICHAEL B. PETTIS |
| | JON F. CARMER, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JON FRANCIS CARMER, JR. |
| | ABIGAIL MARSHALL MARBURY |
| ATTORNEYS FOR APPELLEE: | BEN HARRY STONE |
| | RICKY J. COX |
| | MICHAEL BRANT PETTIS |
| | BRYAN CARL SAWYERS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 08/07/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND COLEMAN, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    This case involves a statutory sales- and use-tax exemption for "pollution control equipment," an administrative regulation interpreting that exemption, and the application of the statutory exemption and administrative regulation to four low-nitrous-oxide (NOx) burners purchased by Mississippi Power and installed at its Plant Watson and Plant Daniel facilities.

¶2. The Mississippi Department of Revenue (MDOR)[1] audited Mississippi Power Company and assessed $251,184.93 in use taxes attributed to Mississippi Power's purchase and installation of low-NOx burners. After unsuccessfully pursuing administrative remedies, Mississippi Power appealed to the Chancery Court of Harrison County, Mississippi. The chancery court reversed and granted summary judgment in favor of Mississippi Power. Aggrieved, the MDOR appeals.

## FACTS AND PROCEDURAL HISTORY

¶3. Mississippi Code Section 27-65-17(1)(e) provides a reduced sales-tax rate (which also applies to use taxes)[2] of 1.5 percent on "sales of manufacturing machinery . . . when made to a manufacturer . . . ." Miss. Code Ann. § 27-65-17(1)(e) (Rev. 2010). The parties stipulated that Mississippi Power is a "manufacturer" as contemplated by the statute, and that the low-NOx burners qualify as "manufacturing machinery." The MDOR assessed use taxes on the burners at the reduced 1.5 percent rate.

¶4. In 2001, the Legislature altogether exempted from sales- and use-tax "pollution control equipment" purchased by manufacturers. Mississippi Code Section 27-65-101(1)(w) reads:

The tax levied by this chapter shall not apply to the following:

---

[1]During the course of the events underlying this appeal, the "Mississippi State Tax Commission" was renamed the "Mississippi Department of Revenue." *See* Miss. Code Ann. § 27-3-4 (Rev. 2010).

[2]*See* Miss. Code Ann. § 27-67-7 (Rev. 2010).

2

(w) From and after July 1, 2001, sales of pollution control equipment to manufacturers or custom processors for industrial use. For the purposes of this exemption, "pollution control equipment" means equipment, devices, machinery or systems *used or acquired* to prevent, control, monitor or reduce air, water or groundwater pollution, or solid or hazardous waste as required by federal or state law or regulation.

Miss. Code Ann. § 27-65-101(1)(w) (Rev. 2010) (emphasis added). Shortly after the passage

of Section 27-65-101(1)(w), the MDOR promulgated Mississippi Administrative Code

Section 35.IV.7.03(302),[3] which reads:

Purchases of pollution control equipment by manufacturers and custom processors are exempt from sales or use tax (Effective July 1, 2001). The term "pollution control equipment" means equipment, devices, machinery or systems used *exclusively and directly* to prevent, control, monitor or reduce air, water or groundwater pollution, or solid or hazardous waste as required by federal law or regulation. Although the main use of the equipment must be for pollution control, the incidental use for other purposes would not result in the exemption being disallowed.

Miss. Admin. Code § 35.IV.7.03(302) (emphasis added).

¶5.     With that background, we now turn to the facts of this case, which are brief and not

in dispute. Between 2007 and 2009, Mississippi Power purchased and installed four low-

NOx burners at its Plant Daniel and Plant Watson facilities (two at each). The existing

burners at the facilities had not reached the end of their life cycles and were not in need of

replacement. However, in order to comply with newly enacted federal regulations which

---

[3]Mississippi Administrative Code 35.IV.7.03 was originally titled Rule 47 of the former Mississippi Sales Tax Rules.

required it to reduce its NOx emissions, Mississippi Power installed the new burners. Mississippi Power remitted no sales and use taxes to the MDOR for the low-NOx burners.[4]

¶6.    In January 2010, the MDOR notified Mississippi Power that it would conduct an audit of Mississippi Power's state tax returns. The audit period was January 1, 2007, through December 31, 2009. At the conclusion of the audit period, the MDOR assessed Mississippi Power use taxes in the amount of $1,831,015. Of that amount, $255,939.94 was attributable to the low-NOx burners for which Mississippi Power had remitted no taxes.

¶7.    Mississippi Power appealed the use-tax assessment to the MDOR's internal Board of Review. Following a hearing, the Board of Review reduced the overall use-tax assessment to $977,053,[5] but affirmed the $251,184.93 attributed to the low-NOx burners. Mississippi Power paid the entire reduced use-tax assessment ($977,053) under protest, and appealed the Board of Review's order to the Board of Tax Appeals (BTA). The BTA conducted a hearing, and, subsequently, affirmed the reduced use-tax assessment.

¶8.    After exhausting its administrative remedies, Mississippi Power filed a "Petition for Appeal and Review" of the BTA's order in the Chancery Court of Harrison County, challenging only the use-tax assessment applicable to the low-NOx burners. Following the

---

[4]Mississippi Power holds a "direct pay permit" authorized under Mississippi Code Section 27-65-93(3), which allows it to pay sales and use tax directly to the MDOR and removes the normal responsibility of the vendor to collect and remit sales tax. Miss. Code Ann. § 27-65-93(3) (Rev. 2010).

[5]Part of the overall reduction reflected a partial payment of $582,977 by Mississippi Power at the time of the assessment.

conclusion of written discovery, Mississippi Power filed a motion for summary judgment. The MDOR then conducted a Rule 30(b)(6) depositions of Mississippi Power. *See* Miss. R. Civ. P. 30(b)(6). After those depositions, the MDOR filed a response to MPC's motion for summary judgment and a counter-motion for summary judgment.

¶9. Following a hearing, the chancery court concluded that Mississippi Administrative Code Section 35.IV.7.03(302) was an invalid regulation, as it conflicted with the plain language of Mississippi Code Section 27-65-101(1)(w). The chancery court further concluded that Section 27-65-101(1)(w) controlled, and that Mississippi Power had "met its burden and demonstrated [that] the low NOx burners qualif[ied] for the exemption under the statute." The chancery court ultimately granted Mississippi Power's motion for summary judgment, denied the MDOR's counter-motion for summary judgment, and ordered that the MDOR reimburse Mississippi Power in the amount of $387,308.75,[6] plus statutory interest.

## ISSUES

¶10. On appeal, we will address the following issues raised by the MDOR, restated as follows:

> I. Whether the chancery court had appellate jurisdiction over Mississippi Power's amended petition for appeal and review.
>
> II. Assuming the chancery court had appellate jurisdiction over Mississippi Power's appeal, whether the court erred in finding the definition of "pollution control equipment" in Mississippi Code Section 27-65-101(1)(w)) to be unambiguous, and in failing to afford deference to the MDOR's interpretation

---

[6]This judgment consisted of $255,939.94 for use taxes, $25,593.99 for penalties, and $105,774.82 for interest assessed by the MDOR.

of "pollution control equipment" in Mississippi Administrative Code 35.IV.7.03(302).

## STANDARD OF REVIEW

¶11.    This Court has held that, "unless an agency's interpretation of a statute 'is repugnant to the plain meaning thereof, [the courts are] to defer to the agency's interpretation.'" *Diamond Grove Ctr., LLC v. Mississippi State Dep't of Health*, 98 So. 3d 1068, 1072 (Miss. 2012) (quoting *Queen City Nursing Ctr., Inc. v. Miss. State Dep't of Health*, 80 So. 3d 73, 84 (Miss. 2011)). "We will not, however, give deference to an agency's statutory interpretation if it is . . . so contrary to the unambiguous language or best reading of a statute." *Id*. (citing *Dialysis Solution, LLC v. Miss. State Dep't of Health*, 31 So. 3d 1204, 1211 (Miss. 2010)). "Further, when a statute is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation." *Id*. (citing *Miss. Methodist Hosp. and Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 21 So. 3d 600, 607 (Miss. 2009)).

## ANALYSIS

**I. Whether the chancery court had appellate jurisdiction over MPC's amended petition for appeal and review.**

¶12.    In order to vest the chancery court with appellate jurisdiction over an appeal from the Board of Tax Appeals, a taxpayer must perfect an appeal by posting a surety bond or pay the amount ordered under protest and seek a refund. Miss. Code Ann. § 27-77-7(3) (Rev. 2010)[7];

---

[7]Amended by 2014 Miss. Laws WL No. 122 (H.B. 1555).

6

*Khurana v. Miss. Dep't of Revenue*, 85 So. 3d 851, 855 (Miss. 2012). Mississippi Power chose the latter and thus was statutorily required to  "prove by a preponderance of the evidence that [it] alone bore the burden of the tax sought to be refunded . . . and did not directly or indirectly collect the tax from anyone else." Miss. Code Ann. § 27-77-7(1), (5) (Rev. 2010).

¶13.    According to the deposition testimony of its comptroller, Cynthia Shaw, Mississippi Power included its 2011 tax payment, which included the amount paid under protest, in its 2012 look-back Performance Evaluation Plan (Plan) filed with the Mississippi Public Service Commission (PSC). Shaw explained that the PEP "is a mechanism for calculating the revenue requirement, a base rate requirement for the company." The MDOR argues that, because Mississippi Power included the 2011 tax payment in its 2012 look-back PEP filing, it recouped the taxes it paid under protest via rates charged to its customers. As such, the MDOR argues that Mississippi Power "shifted the burden of the tax payment to its customers . . . [and] did not prove by a preponderance of the evidence that it alone bore the burden of the tax it was seeking to recover . . . ."

¶14.    The chancellor found this Court's decision in *Monaghan v. Southern Bell Telephone and Telegraph Company*, 136 So. 2d 198 (Miss. 1962), controlling. In that case, the MDOR assessed $43,489.76 in additional sales taxes against Southern Bell, which represented "two per cent of the gross income . . . derived from sales of intrastate . . . . telephone services to government agencies" from April 1, 1955, through July 31, 1956. *Id*. at 198-99. Southern Bell paid the amount under protest and appealed to chancery court, arguing that the

additional taxes "should not apply to sales of telephone services to governmental agencies."

*Id*.

¶15.  Prior to 1954, sales billed directly to governmental agencies were not exempt from taxes; thus, Southern Bell was required to remit taxes on those sales to the MDOR. Like Mississippi Power, Southern Bell's rates were "fixed by the Mississippi Public Service Commission[.]" *Id*. at 200. In fixing Southern Bell's rates, the PSC "first determined the overall intrastate revenue requirements of the company, taking into account the operating expenses and taxes of the company[.]" *Id*.

> It was . . . stipulated . . . that, in presenting facts to the Public Service Commission to enable it to determine the general revenue level to be allowed, Southern Bell, in each instance since the enactment of the Sales Tax Law in 1932, and up until June 15, 1954, presented to the Commission as an expense item, along with all other expenses, such as salaries, wages, ad valorem taxes, franchise taxes etc., an amount equal to two per cent of the gross income of its intrastate business; and that the Public Service Commission in its rate hearings considered and accepted the two per cent tax as an expense item in determining and settling the general revenue level which the company was entitled to receive.

*Id*. at 201. The PSC "then prescribed or approved a schedule of individual rates and charges which would produce the amount of revenue required to meet the operating expenses and taxes of the company and provide a fair rate of return to the company upon the reasonable value of its intrastate property." *Id*. at 200.

¶16.  In 1954, the Legislature amended the applicable statute to provide that "tax[es] levied and assessed under this act shall not apply . . . when such sales are billed directly to and payment therefor is made directly by the United States Government, the State of Mississippi,

8

its departments and institutions, counties and municipalities." *Id*. at 199-200. Despite the 1954 amendment, no subsequent "change was made in the rates charged such customers[.]" *Id*. at 201. Because Southern Bell continued to collect the same rates after the removal of that particular tax expense from its revenue requirement, the MDOR argued that Southern Bell recouped the taxes from its customers, thus "failing to allege and prove . . . that it alone bore the burden of the tax sued for and did not directly or indirectly collect the tax from its customers." *Id*. at 202.

¶17.    The ***Southern Bell*** Court rejected the MDOR's argument, stating:

> The tax was never added to the telephone subscribers' bills as a separate charge. The tax was treated by the Public Service Commission as a part of the cost to the company of furnishing services and in the fixing of rates and charges was intermingled with other operating expenses of the company and absorbed in the composite rates approved by the Commission.

*Id*. at 204. Because the taxes were "absorbed" into the rates and indistinguishable from all other expenses considered by the PSC to determine Southern Bell's revenue requirements for rate-setting purposes, the Court held that Southern Bell "alone bore the burden of the tax to be recovered." *Id*.

¶18.    In the case *sub judice*, Shaw explained the various costs, including the use taxes, that Mississippi Power presented to the PSC for consideration of Mississippi Power's revenue requirement. Shaw testified that she could not "tell . . . how much tax was collected through the rates" because taxes are an "indistinguishable part of the overall revenue requirement calculation." She testified that "use taxes . . . become part of the costs of projects" and are "not tracked as taxes in the accounting records, and they're not separate in the filings as

9

taxes, and they're not included on the bill as taxes." Shaw further explained that "[i]n the case of . . . taxes, like income taxes, use taxes, payroll taxes, there is not a dollar for dollar recovery. Those things are included in the overall calculation of revenue requirement and they're not identifiable components of the revenue requirement calculation, and that overall revenue requirement is then used to determine those detailed rate schedules or prices to customers."

¶19. Shaw's unrefuted testimony fits squarely with this Court's decision in *Southern Bell*. While the use-tax assessment admittedly was included in Mississippi Power's 2012 look-back PEP filing, the use tax was only one consideration of the PSC in determining Mississippi Power's overall revenue requirement. If recovered at all, the use taxes "were absorbed in the . . . rates approved by the" PSC and were "never added to the [ratepayers'] bills as a separate charge." *Id*. at 204. Mississippi Power met its burden to "prove by a preponderance of the evidence that [i]t alone bore the burden of the tax sought to be refunded . . . and did not directly or indirectly collect the tax from anyone else." Miss. Code Ann. § 27-77-7(1), (5) (Rev. 2010). Therefore, the chancery court had appellate jurisdiction over this suit.

**II. Assuming the chancery court had appellate jurisdiction over Mississippi Power's appeal, whether the court erred in finding the definition of "pollution control equipment" in Mississippi Code Section 27-65-101(1)(w) to be unambiguous, and in failing to afford deference to the MDOR's interpretation of "pollution control equipment" in Mississippi Administrative Code 35.IV.7.03(302).**

10

¶20. We will first address the ambiguity, *vel non*, of Section 27-65-101(1)(w). When called upon to examine a statute, "the Court first looks to the language of the statute." ***Lawson v. Honeywell Intern., Inc.***, 75 So. 3d 1024, 1027 (2011) (citing ***Pinkton v. State***, 481 So. 2d 306, 209 (Miss. 1985)). "If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." ***Id***. (citing ***Clark v. State ex rel. Miss. State Med. Ass'n***, 381 So. 2d 1046, 1048 (Miss. 1980)).

¶21. Section 27-65-101(1) reads, in pertinent part:

> The tax levied by this chapter shall not apply to the following:
>
> . . . .
>
> (w) From and after July 1, 2001, sales of pollution control equipment to manufacturers or custom processors for industrial use. For the purposes of this exemption, "pollution control equipment" means equipment, devices, machinery or systems *used or acquired* to prevent, control, monitor or reduce air, water or groundwater pollution, or solid or hazardous waste as required by federal or state law or regulation.

Miss. Code Ann. § 27-65-101(1)(w) (Rev. 2010) (emphasis added).

¶22. It is undisputed in this case that Mississippi Power acquired and used the low-NOx burners to reduce NOx emissions in order to comply with federal regulations. The existing burners at Plant Daniel and Plant Watson had not reached the end of their life cycles. Additionally, the low-NOx burners are less efficient in production than the existing burners. However, because of changes in the federal regulations (the "Clean Air Act" and "Clean Air Insterstate Rule"), Mississippi Power was required to reduce its NOx emissions or purchase

11

emissions credits from other producers. Rather than purchase emissions credits, Mississippi Power elected to invest in low-NOx burners and reduce its pollution output. The undisputed testimony is that the low-NOx burners have reduced Mississippi Power's pollution output by 50 percent in each boiler in which the burners were installed.

¶23.    The low-NOx burners purchased and installed by Mississippi Power satisfy the plain language of the statutory definition – they were "*used or acquired* to prevent, control, monitor or reduce air, water or groundwater pollution, or solid or hazardous waste *as required by federal* or state *law* or regulation." Miss. Code Ann. § 27-65-101(1)(w) (Rev. 2010). The MDOR never has argued that the low-NOx burners do not meet the statutory definition.

¶24.    Instead, the MDOR argues that the statute is ambiguous by "virtue of [its] silence" because it fails "to address the situation where a manufacturer purchases equipment . . . that is necessary for day-to-day business operations and the final marketable product of the manufacturers, yet may also have a pollution control effect."[8] It is the MDOR's position that equipment which serves a dual purpose (production and pollution control) does not qualify for the exemption under Mississippi Administrative Code 35.IV.7.03 because the equipment is not used "exclusively and directly" for pollution control. The MDOR further contends that the regulation was necessary to prevent "an exemption free for all."

---

[8]This Court has stated that "statutory interpretation is appropriate if a statute is ambiguous or is silent on a specific issue." **Buffington v. Mississippi State Tax Comm'n**, 43 So. 3d 450, 454 (Miss. 2010) (quoting **Miss. Methodist Hosp. and Rehab. Ctr., Inc. v. Miss. Div. of Medicaid**, 21 So. 3d 600, 607-08 (Miss. 2009)).

¶25. Whether the statute creates a potential tax loophole is the concern of the Legislature, not this Court. Despite its contention that it did not restrict or redefine the statute in promulgating Mississippi Administrative Code 35.IV.7.03 (302), the MDOR did in fact redefine and restrict the term "pollution control equipment." Both the statute and the regulation provide that "pollution control equipment *means* . . . ." (Emphasis added.) After this introductory statement, the statute and regulation are verbatim, except that the regulation altogether removed the words "or acquired" and replaced them with the adverbs "exclusively and directly." We conclude that the insertion of the adverbs "exclusively and directly" places a more stringent requirement on the "use" of the "pollution control equipment" than that provided by the Legislature.

¶26. In essence, the MDOR rewrote the exemption provision to provide what it believes the Legislature should have written and adopted to reflect what the MDOR calls a "good tax policy." This Court, however, does not view statutes in this manner. "The function of the Court is not to decide what a statute should provide, but to determine what it does provide." *Lawson*, 75 So. 3d at 1027 (citing *Russell v. State*, 94 So. 2d 916, 917 (Miss. 1957)). "The Court must not broaden or restrict a legislative act." *Id*. (citing *Barbour v. State ex rel Hood*, 974 So. 2d 232, 240 (Miss. 2008)). Section 27-65-101(1)(w) clearly does not require the equipment be "used exclusively and directly" for pollution-control equipment to be tax-exempt.

¶27. Mississippi Code Section 27-65-93 grants the MDOR the authority to "promulgate rules and regulations, not inconsistent with the provisions of the sales tax law . . . ." Miss.

13

Code Ann. § 27-65-93(1) (Rev. 2010). Stated in the negative, the MDOR "may not promulgate rules that alter or amend or negate the effect of a statute and may not overstep [its] authority by creating regulations inconsistent with the controlling statutes." *American Federated Life Ins. Co. v. Dale*, 701 So. 2d 809, 812 (Miss. 1997). The MDOR exceeded its authority in promulgating Mississippi Administrative Code 35.IV.7.03(302), for it is inconsistent with the plain language of Section 27-65-101(1)(w).

## CONCLUSION

¶28.    Based on the foregoing analysis, the chancellor correctly concluded that Mississippi Administrative Code 35.IV.7.03(302) was an invalid regulation. The chancellor further was correct that the low-NOx burners qualified for the tax exemption under the plain language of Section 27-65-101(1)(w) and the evidence produced by Mississippi Power. Therefore, the chancellor correctly ordered that the MDOR refund Mississippi Power the use taxes assessed on the low-NOx burners, plus penalties and interest.

¶29.    **AFFIRMED**.

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**